UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LARRY OUTLAW, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:11-cv-1440-TWP-DKL |
| ) | |
| CORRECTIONAL MEDICAL SERVICES, INC., ) | |
| MICHELLE BERTRAM, STEPHANIE CLAPP, ) | |
| ALISHA COOMER, JESSICA KENEKHAM, ) | |
| ANITA KERRIGAN, KELLY KURTZ, AMBER ) | |
| LAMB, BRAD OWENS, THE GEO GROUP, INC.,) | |
| G. THOMPSON, K. GARD, M. KRUL, ) | |
| OFC. PRATER, OFC. M. SPARKS, ) | |
| JANE/JOHN DOE, and D. ITTENBACH, ) | |
| ) | |
| Defendants. ) | |

### ENTRY DISCUSSING MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Larry Outlaw ("Mr. Outlaw") has filed a complaint which alleges Correctional Medical Services, Inc. ("CMS"),[1] Michelle Bertram, Stephanie Clapp, Alisha Coomer, Jessica Kenekham, Anita Kerrigan, Kelly Kurtz, Amber Lamb, and Brad Owens (hereinafter, "the medical defendants") were deliberately indifferent to his serious medical needs by failing to provide him with medical care and by not prescribing him a new pair of eyeglasses while he was incarcerated at the New Castle Correctional Facility, an Indiana prison. The claims against each individual defendant are the following:

> Stephanie Clapp, LPN, allegedly refused to get Mr. Outlaw a new pair of eyeglasses on August 17, 2009.[2]

---

[1] Correctional Medical Services, Inc. is the company that contracts with the Department of Correction to provide medical services to state prisons.

[2] See Plaintiff's Complaint, Statement of Facts, paragraph 8, attached to the Designation of Pleadings and Evidence as Exhibit A, Dkt 31-1 (hereinafter "Exhibit A").

Alisha Coomer, LPN, allegedly refused to give Mr. Outlaw a pair of eyeglasses from August 17, 2009 to November, 2009.[3]

Jill Kenekham, LPN; Amber Lamb, LPN; and Michelle Bertram, LPN allegedly failed to administer proper first aid to Mr. Outlaw, failed to take his vital signs, and failed to contact the eye doctor from August 17, 2009 to November 4, 2009.[4]

Kelly Kurtz, Brad Owens, and Anita Kerrigan, N.P. allegedly failed to administer proper first aid and CPR, failed to take Mr. Outlaw's vital signs, and failed to respond to his Requests for Healthcare and schedule him to see the eye doctor from August 17, 2009 to November 4, 2009.[5]

There are no specific factual allegations asserted against Correctional Medical Services, Inc.

The medical defendants seek resolution of the claims alleged against them through summary judgment.

## I. STANDARD OF REVIEW

The motion for summary judgment in this civil rights action, as with any such motion, must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The substantive law identifies that facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372 (2007).

## II. MATERIAL FACTS

As an initial matter, the Court must discuss the adequacy of Mr. Outlaw's opposition of the motion for summary judgment. Local Rule 56-1(b) requires a brief in opposition to a motion for summary judgment to include a section labeled "Statement of Material Facts in Dispute."

---

[3] Exhibit A, paragraph 9.
[4] Exhibit A, paragraph 10.
[5] Exhibit A, paragraph 11.

The "Statement" must respond to the movant=s asserted material facts by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment. These facts must be supported by appropriate citations to admissible evidence. See 56-1(e). Such citation must be by page or paragraph number or similar specific reference. *Id.*

In response to the medical defendants' statement of material facts not in dispute, Mr. Outlaw did provide a "Statement of Disputed Factual Issues." (*See* Dkt. 41-1.) In this Statement Mr. Outlaw lists questions that he would like answered in his favor, such as "whether the medical defendant(s) were deliberately indifferent to Plaintiff's serious medical needs." Those questions, however, are not supported by facts with citations to admissible evidence; such as a citation to a discovery response, a deposition, or an affidavit. Local Rule 56-1(f) provides that the court will assume that the facts as claimed and supported by admissible evidence by the movant are admitted without controversy except to the extent that the non-movant specifically controverts the facts in that party's "Statement of Material Facts in Dispute" with admissible evidence.

Although we construe *pro se* filings liberally, *pro se* litigants are not exempt from procedural rules. *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008). Compliance with Federal Rules of Civil Procedure 56 and Local Rule 56.1 are necessary to the court's efficient review of this and every case. *See, e.g., Greer v. Bd. of Educ., of the City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001); *Members v. Paige,* 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced"). The Seventh Circuit has "consistently and repeatedly upheld" district courts' discretion to require compliance with the local rules governing summary judgment. *Bordelon v. Chicago Sch. Reform Bd. of*

*Trustees*, 233 F.3d 524, 527 (7th Cir. 2000); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (collecting numerous cases).[6]

Because Mr. Outlaw has not properly opposed the motion for summary judgment, the Court must treat that failure as an admission of the truth of the medical defendants' statement of material facts for purposes of the court acting on the motion for summary judgment. See *Johnson v. Gudmundsson,* 35 F.3d 1104, 1108 (7th Cir. 1994). This is the result of Local Rule 56-1, of which Mr. Outlaw was notified. This, however, does not alter the standard for assessing a Rule 56 motion, but does Areduc[e] the pool@ from which the facts and inferences relative to such a motion may be drawn. *Smith v. Severn,* 129 F.3d 419, 426 (7th Cir. 1997). The undisputed material facts are as follows:

Mr. Outlaw was incarcerated at the New Castle Correctional Facility from August 2009 to November 4, 2009 in a segregation unit. Mr. Outlaw suffers from diabetes, a disease which can be complex and often difficult to control; therefore, Mr. Outlaw was enrolled in the prisons' Chronic Care Clinic for diabetes. As a Chronic Care offender, Mr. Outlaw was seen every 12 weeks for his condition and his diabetes was managed with a diabetic diet, exercise, oral medication, insulin, routine blood sugar checks, and a quarterly lab test called a hemoglobin A1c test ("A1c"); which monitors blood sugar levels so that doctors can make adjustments to medication, if needed. Mr. Outlaw had a medical history of sometimes refusing insulin, oral medication, and blood sugar checks, as well as not being compliant with a diabetic diet and ordering foods off the Commissary that are high in sugar and not good for him. Consequently,

---

[6] The Court also notes that the affidavit submitted by Mr. Outlaw with his response in opposition to the motion for summary judgment does not comply with Rule 56(c)(4), in that it contains multiple statements not based on personal knowledge, states facts which would not be admissible in evidence and does not show that Mr. Outlaw has the qualifications to testify on the medical matters asserted. Finally, Mr. Outlaw does not provide an affidavit specifying why he cannot present facts essential to justify his opposition as required by Rule 56(d).

Mr. Outlaw's diabetes is not well-controlled and he often has elevated blood sugars and an elevated A1c.

Mr. Outlaw was examined in the Chronic Care Clinic by Anita Kerrigan, N.P. on August 5, 2009. Mr. Outlaw had been compliant with taking his insulin, but reportedly had been buying food from the Commissary. His hemoglobin A1c was 10.1, so Nurse Practitioner Kerrigan increased his insulin. Mr. Outlaw did not complain of any eye symptoms or vision difficulties during this examination. On August 19, 2009, Nurse Practitioner Kerrigan reviewed Mr. Outlaw's food purchases from the Commissary to determine whether she needed to adjust his insulin. On August 29, 2009, Mr. Outlaw refused his morning and evening insulin. Mr. Outlaw also requested to receive a regular diet rather than a diabetic diet and stated that he was no longer diabetic. Mr. Outlaw's blood sugar was taken that morning and was within normal limits. On August 30, 2009, Mr. Outlaw submitted a Request for Healthcare because he had "bleeding blood vessels" in his eyes and he was supposed to wear his glasses "at all times relevant" and that on August 17, 2009, custody staff confiscated and destroyed his eyeglasses. He claimed he had headaches and dizziness from not having his eyeglasses. That same day, Nurse Alicia Coomer responded to the Request and informed Mr. Outlaw that she had referred him to the eye doctor.

On September 1, 2009, Nurse Michelle Bertram attempted to check Mr. Outlaw's blood sugar and he grabbed the accu-check machine from her and attempted to negotiate its return. On September 21, 2009, Mr. Outlaw submitted a Request for Healthcare asking for an annual medical review as asked for a checkup of the following: "eyes (eye doctor), teeth (dentist), feet (podiatrist), skin infection (dermatologist), a reliable diabetes educator (RN,RD or RPH) who has a special interest in training and caring for people with diabetes". On September 22, 2009

health care staff responded that Mr. Outlaw would be notified when his appointment will be set. Mr. Outlaw submitted another Request for Healthcare on September 21, 2009, complaining that officers confiscated his tennis shoes, which he needed for diabetic neuropathy and medical staff responded that same day agreeing with Mr. Outlaw that he is required to have properly fitting shoes, and if his shoes do not fit, he should tell his case manager. On September 29, 2009, Dr. Charpentier reviewed Mr. Outlaw's recent blood sugars and renewed his medication. Nurse Practitioner Kerrigan adjusted Mr. Outlaw's medication on October 1, 2009 and renewed his medication the next day. On October 18, 2009, Mr. Outlaw submitted a Request for Healthcare stating he had a severe case of neuropathy[7] and complained about his shoes. On October 19, 2009, Mr. Outlaw submitted a Request for Healthcare regarding his cell assignment and again complained about shoes. On October 21, 2009, Dr. Charpentier ordered State issued boots for Mr. Outlaw.

On October 26, 2009, Mr. Outlaw submitted a Request for Healthcare asking for a refill of his medication. Rick Willyard, N.P. examined Mr. Outlaw on October 28, 2009. He noted that Mr. Outlaw would only take his insulin from certain nurses and that he was non-compliant with his medical regimen. On November 3, 2009, Mr. Outlaw refused his evening insulin, medication, and blood sugar check and was belligerent and verbally abusive to the nurse. Mr. Outlaw transferred from the New Castle Correctional Facility to the Indiana State Prison on November 4, 2009. Mr. Outlaw saw the optometrist at the Indiana State Prison on December 8, 2009.

The evidence before the Court is that from August 1, 2009 to November 4, 2009, while Mr. Outlaw may not have always felt well, he was not in any medical distress, did not experience

---

[7] Diabetic neuropathy is damage to nerves in the body that occurs due to high blood sugar levels. Symptoms can range from pain and numbness in the extremities, to problems with the digestive system, urinary tract, blood vessels and heart.

6

any diabetic complications, and never experienced unconsciousness or diabetic shock. Mr. Outlaw did not require CPR, first aid, or his vital signs to be taken from August 1, 2009 to November 4, 2009 because he was not in any medical distress or experiencing any serious complication from diabetes, or any illness whatsoever. Furthermore, during his time at the New Castle Correctional Facility, Mr. Outlaw did not experience any serious medical need or complication whatsoever from his diabetes, including vision or eye problems, despite his frequent non-compliance with his treatment regimen.

According to the medical records, Mr. Outlaw does not have "bleeding blood vessels" in his eyes, but instead has early-stage diabetic retinopathy, which is a non-emergent, chronic change to the retina of the eyes caused by diabetes. Eyeglasses have nothing to do with treating or controlling diabetic retinopathy. The only way to treat or control Mr. Outlaw's diabetic retinopathy is to control his diabetes, particularly his blood sugar. Medical staff at the New Castle Correctional Facility, including each of the individual medical defendants, had no control over whether an offender receives eyeglasses. All the medical staff could do was refer Mr. Outlaw to the prison optometrist, who examines the offender when he is at the prison. The prison optometrist was typically at the New Castle Correctional Facility once or twice a month, depending on how many patients he had to see. Medical staff at the New Castle Correctional Facility had no control over the prison optometrist's schedule and no control over how many or which patients the optometrist saw. It was not uncommon for the prison optometrist not to come to the prison for a month. All medical staff could do is tell the prison optometrist which offenders needed to be seen. If an offender had a medical issue involving the eye other than eyesight, medical staff could refer the offender to an ophthalmologist or the emergency room if necessary. This was never necessary for Mr. Outlaw.

7

Additionally, medical defendants had no control or involvement with the correctional officers' confiscation of Mr. Outlaw's eyeglasses in August, 2009. The medical defendants could not give Mr. Outlaw a new pair of glasses because glasses had to be ordered by the optometrist. The only thing the medical defendants could do was refer Mr. Outlaw to the optometrist, which they did once an appointment was available. The medical care rendered to Mr. Outlaw was reasonable, appropriate, and within the standard of care. Admittedly, diabetes is an awful disease, however, Mr. Outlaw's diabetes was stable while at the New Castle Correctional Facility. While at New Castle, he never experienced a serious medical need from his diabetes, and his condition never required emergency measures.

Further, Defendant Kelley Kurtz ("Ms. Kurtz") was the Health Services Administrator at the New Castle Correctional Facility from August to November 2009. Her job was to order medical supplies for the facility, hire medical staff, maintain the nursing staff schedule, respond to offender grievances regarding medical issues, and deal with human resources issues for the medical staff. Ms. Kurtz never treated or provided any medical care to any offender at the New Castle Correctional Facility, including Mr. Outlaw. Ms. Kurtz did not make any treatment decisions regarding offenders and had no involvement in determining whether an offender needed a particular medical procedure or medication. Ms. Kurtz's role as Health Services Administrator was administrative and she did not provide input or guidance regarding any offender's course of medical treatment. She did not review offenders' requests for healthcare, nor did she schedule offenders to see the nurses or doctors; that job was done by a member of the nursing staff. Simply stated, Ms. Kurtz had no authority over, and did not exercise any control over, the physician or nursing staff with regard to their medical care and treatment of Mr. Outlaw. Ms. Kurtz did not render first aid or CPR to any offender, because she is not a medical

provider, but was part of the administrative staff in the medical department at the New Castle Correctional Facility. The decisions regarding Mr. Outlaw's course of treatment were made by the doctors and nurses, not by Ms. Kurtz.

### III. DISCUSSION

The Eighth Amendment imposes a duty on prison officials to provide medical care to inmates. *Vance v. Peters,* 97 F.3d 987, 991 (7th Cir. 1996), *cert. denied,* 520 U.S. 1230 (1997). In order for an inmate to state a claim under 42 U.S.C. § 1983 for medical mistreatment or denial of medical care, the prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). Deliberate indifference exists only when an official "knows of and disregards an excessive risk to an inmate's health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (construing *Estelle*). A condition is serious if "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir. 1997) (citation and internal quotations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

The medical defendants in this civil rights action have met the above burden in their motion for summary judgment which must therefore be granted. The medical defendants have, in particular, shown that there was no violation of Mr. Outlaw=s federally secured rights associated with the delivery of necessary medical services to Mr. Outlaw during his confinement at the New Castle Correctional Facility. A court examines the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs. *Reed v. McBride,* 178 F.3d 849, 855 (7th Cir. 1999). Mr. Outlaw has established that he has serious and complex medical needs. However, the designated evidence establishes that the medical defendants as well as other medical personnel exercised their professional judgment in Mr. Outlaw's best interests, and well within the bounds of the Constitution, in meeting his medical needs and concerns. In support of this conclusion, the Court finds the following:

1. There is no evidence to support Mr. Outlaw's claim that he required first aid and his vital signs to be taken from August 17, 2009 to November 4, 2009. The undisputed facts show that Mr. Outlaw's medical condition was stable during this time period and did not require the administration of CPR, first aid, or that his vital signs be taken. The medical defendants did not violate Mr. Outlaw's constitutional rights by not giving him medical treatment that he did not require.

2. The medical defendants referred Mr. Outlaw to the prison optometrist once they became aware that Mr. Outlaw needed a new pair of glasses, but medical defendants had no control over when the optometrist came to the prison. The medical defendants did all that was in their power to do with regard to Mr. Outlaw's eyeglasses and they cannot be found deliberately indifferent for failing to give Mr. Outlaw a new pair of glasses when they did not have the power or authority to prescribe eyeglasses.

3. Mr. Outlaw has diabetes which is a serious medical condition for which he was being monitored and treated through the Chronic Care Clinic with regular blood sugar checks, regular lab work, oral medication, insulin, a diabetic diet, and instructions for food restrictions and exercise. The undisputed medical evidence shows that Mr. Outlaw's diabetes was stable and he was not in any medical distress or having any diabetic complication during the relevant time period.

    4. Mr. Outlaw has diabetic retinopathy, which is a non-emergent, chronic condition of the eye which is not treated or controlled by eyeglasses. Rather, Mr. Outlaw's diabetic neuropathy is controlled by diabetes management. Although Mr. Outlaw did have a serious health condition of the eye there is no evidence that he needed any emergency medical treatment for his eyes.

In addition, the evidentiary record negates the presence of the subjective state of mind required to show deliberate indifference, i.e., that the medical defendants were "subjectively aware of [Outlaw=s] serious medical needs and disregarded an excessive risk that a lack of treatment posed to his health or safety." *Wynn v. Southward,* 251 F.3d 588, 593 (7th Cir. 2001). Because of this showing, the medical defendants are entitled to the entry of judgment in their favor and against the plaintiff. *Celotex Corp.*, 477 U.S. at 322-23 (explaining that when the moving party has met the standard of Rule 56, summary judgment is mandatory).

    CMS is entitled to judgment as a matter of law on an additional independent basis. CMS is a corporation, and a private corporation is not vicariously liable under 42 U.S.C. ' 1983 for its employees' deprivations of others' civil rights, but can only be liable if the injury alleged is the result of a policy or practice. *Chaves v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001); *Johnson v. Dossey,* 515 F.3d 778, 782 (7th Cir. 2008). This element of a viable claim is absent as to the claim against CMS. Mr. Outlaw has not presented any evidence that CMS's customs, practices, policies, or procedures violated his constitutional rights.

## IV. <u>CONCLUSION</u>

    There is no doubt that Mr. Outlaw was entitled to certain constitutional protections while confined at the prison in New Castle, including constitutionally adequate medical care. He has not, however, come forward with a genuine issue for trial. *Liberles v. County of Cook,* 709 F.3d 1122, 1126 (7th Cir. 1983) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment

11

should not be entered."). "Summary judgment is not a discretionary remedy. If the plaintiff lacks enough evidence, summary judgment must be granted." *Jones v. Johnson,* 26 F.3d 727, 728 (7th Cir. 1994), *cert. granted* 513 U.S. 1071 (1995). That is precisely the situation with respect to the present case, and the medical defendants' (Correctional Medical Services, Inc. ("CMS"),[8] Michelle Bertram, Stephanie Clapp, Alisha Coomer, Jessica Kenekham, Anita Kerrigan, Kelly Kurtz, Amber Lamb, and Brad Owens) motion for summary judgment (Dtk. 28) must therefore be **GRANTED**.

No partial final judgment shall issue at this time as claims against the remaining defendants are not resolved by this Entry.

SO ORDERED.

Date: 02/19/2013

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

---

[8] Correctional Medical Services, Inc. is the company that contracts with the Department of Correction to provide medical services to state prisons.

DISTRIBUTION:

Larry Outlaw, #900496
WESTVILLE CONTROL UNIT
Inmate Mail/Parcels
5501 South 1100 West
Westville, Indiana  46391

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

James F. Bleeke
BLEEKE DILLON CRANDALL, P.C.
jim@bleekedilloncrandall.com

Adam Garth Forrest
BOSTON BEVER KLINGE CROSS & CHIDESTER
aforrest@bbkcc.com